**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| JAMES E. BARANOWSKI, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-1379 |
| | ) | Judge Nora Barry Fischer |
| CAPTAIN ROGER N. WATERS and | ) | |
| LIEUTENANT CHARLES L. DEPP, | ) | |
| Defendants. | ) | |

## OPINION

### I.    Introduction

This is an action involving a police officer who claims that he was constructively discharged in retaliation for speech protected by the First and Fourteenth Amendments to the United States Constitution.  Plaintiff James E. Baranowski ("Baranowski") seeks compensatory damages, punitive damages, reinstatement, back pay, equitable relief, attorney's fees, costs, and any other relief deemed by the Court to be appropriate.  Doc. No. 1, p. 3.  He brings this action against Captain Roger N. Waters ("Waters") and Lieutenant Charles L. Depp ("Depp"), who were his superiors during the course of his employment with the Pennsylvania State Police.  *Id.*, p. 2, ¶¶ 4-5.  Presently before the Court is a Motion for Summary Judgment filed by the Defendants.  Doc. No. 23.  For the reasons that follow, the Court will GRANT this Motion for Summary Judgment.

### II.    Factual Background

Baranowski is a veteran of the United States Army.  Doc. Nos. 45, ¶ 2, 49, ¶ 2.  Having served on active duty from 1980-1983, he was honorably discharged at the rank of Spc-4.  *Id.*  His military occupational specialty was military police work.  *Id.*  He also served as a member of the United States Army Reserve, receiving an honorable discharge in 1992 at the rank of sergeant.  *Id.*

Baranowski commenced his employment with the Pennsylvania State Police on August 11, 1986. *Id.*, ¶ 1. As of July 2003, he had held the rank of sergeant for approximately eight years. *Id.* Between August 1986 and February 2003, he had never been subject to discipline for serious misconduct in connection with his employment as a police officer. *Id.*, ¶ 4. He received numerous commendations related to the performance of his duties. *Id.*, ¶ 5. His performance in 2002 was considered to be "satisfactory." *Id.*, ¶ 6.

On December 24, 2002, Michael Ellerbe ("Ellerbe"), a 12-year old black male, was fatally shot in the back by a member of the Pennsylvania State Police. *Id.*, ¶ 11. According to police officers Samuel Nassan ("Nassan") and Juan Curry ("Curry"), Ellerbe was suspected of having stolen a vehicle. *Id.*, ¶ 12. The shooting occurred while Ellerbe allegedly attempted to flee from Nassan and Curry after exiting the vehicle believed to have been stolen. *Id.*, ¶ 13.

Baranowski was on duty at the Uniontown barracks at the time of the shooting. *Id.*, ¶ 14. Shortly after the shooting, Baranowski arrived at the scene. *Id.*, ¶ 15. Because he was the highest ranking officer at the scene, he was considered to be the "incident commander." *Id.*, ¶ 14. He gleaned knowledge about the shooting by observing the scene and discussing the incident with Nassan and Curry. *Id.*, ¶ 16. Baranowski's initial observations did not cause him to question the accuracy of the information given to him by Nassan and Curry. *Id.*, ¶ 17.

On December 27, 2002, Baranowski completed a Homicide Investigation Action Report. Doc. No. 26-10, pp. 12-17. He reported that, upon his arrival at the scene, Nassan approached him and stated: "I shot him, he['s] just a kid. I thought he had shot Curry and I ordered him to stop and take his hands out of his pocket. He refused and I shot him once." *Id.*, p. 12. Curry indicated that he had also discharged his weapon. Curry allegedly stated: "I slipped on the fence and my weapon

2

went off.  I fell to the ground and when I heard a second shot, I jumped up and saw the actor was down.  When I jumped up, Nassan asked me if I had been shot and I stated ['No']." *Id.*  Baranowski recorded his observation of a black juvenile male lying "face up on the sidewalk[.]" *Id.*, p. 13.  He indicated that the juvenile had "a large gaping exit wound located in the center front of the chest and a small entry wound in the center back of the chest." *Id.*  The juvenile had no vital signs, and he was lying in a "pool of blood[.]" *Id.*  Two bullet casings were reportedly recovered from the scene.  *Id.*, p. 16.  One was found on the east side of the fence, while the other was located on the west side of the fence.  *Id.*

Baranowski contends that, after reflecting on the matter and hearing more about the Ellerbe shooting, he began to suspect that the shooting had not occurred in the manner described by Nassan and Curry.  Doc. No. 45, ¶ 18.  On February 12, 2003, an FBI agent questioned Baranowski about the shooting at the Uniontown State Police Barracks.  *Id.*, ¶ 20.  Depp was the "Troop B" Uniontown Barracks Station Commander at that time.  Doc. Nos. 45, ¶ 21, 49, ¶ 21.  Baranowski asserts that, after he was questioned by the FBI agent, Depp summoned him to his office.  Doc. No. 45, ¶ 20.  Baranowski further contends that Depp asked him about the Ellerbe shooting, and that he informed Depp of his view that the shooting did not occur as Nassan and Curry had described.  *Id.*, ¶ 28.  During the course of this conversation, Baranowski allegedly insinuated that he suspected a "cover up." *Id.*, ¶ 29.  According to Baranowski, Depp abruptly warned him to "mind [his] own business," since he was not a part of the investigation.  Doc. No. 26-9, p. 21.  In his deposition, Depp testified that this conversation never took place.  Doc. No. 35-4, pp. 11-12.

Waters is the Commander of "Troop B," which is headquartered in Washington, Pennsylvania.  Doc. Nos. 45, ¶ 32, 49, ¶ 32.  He apparently selected Depp to be Troop B's

Uniontown Station Commander, in part, because of the Ellerbe shooting. *Id.*, ¶ 34. Approximately one week after Baranowski allegedly relayed his concerns about the Ellerbe shooting to Depp, he expressed similar concerns to Waters. *Id.*, ¶ 38. According to Baranowski, Waters did not respond to his comments. Doc. No. 45, ¶ 38.

Baranowski asserts that Depp subsequently summoned him to his office for the purpose of warning him not to perform private investigative work on behalf of Ellerbe's family. *Id.*, ¶ 39. Depp allegedly told Baranowski that any attempt on his part to assist Ellerbe's family would lead to serious consequences. *Id.* Between March 3, 2003, and March 11, 2003, Depp initiated six separate "Use of Force or Complaint Reception and Processing Worksheets" against Baranowski, none of which were based on conduct related to the investigation concerning the Ellerbe shooting. Doc. Nos. 45, ¶ 40, 49, ¶ 40. All of the complaints against Baranowski were ultimately sustained by Waters between June 2003 and October 2003. *Id.*, ¶ 42.

A "Pre-Disciplinary Conference" was apparently held on June 30, 2003. Doc. No. 45, ¶ 47. On that day, Waters sustained four of the complaints which had been filed against Baranowski. Doc. No. 26-10, pp. 122-125. Baranowski alleges that Waters informed him that his job was in jeopardy. Doc. No. 45, ¶ 47. If the Pennsylvania State Police had terminated Baranowski's employment because of the disciplinary complaints which had been lodged against him, he would have lost retirement and medical benefits to which he was otherwise entitled. Doc. Nos. 45, ¶ 49, 49, ¶ 49. Fearing that he would be terminated, Baranowski gave the Pennsylvania State Police his "notice of retirement" on July 7, 2003. *Id.*, ¶ 50. A few days later, he was relieved of his duties as a sergeant and placed on desk duty. *Id.*, ¶ 51. His weapon was confiscated. *Id.* Baranowski was unable to obtain an Honorable Discharge Certificate from the Pennsylvania State Police. Doc. No. 38-7, p.

2.

On May 23, 2005, Baranowski filed a praecipe for a writ of summons against Waters and Depp in the Court of Common Pleas of Fayette County, Pennsylvania. Doc. No. 38-9, pp. 2-3. This was apparently done for the purpose of tolling Pennsylvania's two-year statute of limitations. 42 Pa.C.S.A. § 5524. Baranowski proceeded to file a complaint against Waters and Depp in this Court on September 30, 2005, alleging that they had constructively discharged him from the Pennsylvania State Police in retaliation for his comments about the Ellerbe shooting. Doc. No. 1, ¶¶ 10-12. His claim, which is based on the First and Fourteenth Amendments to the United States Constitution, is brought pursuant to 42 U.S.C. § 1983. *Id.*, ¶ 14. Waters and Depp filed a Motion for Summary Judgment on August 23, 2007. Doc. No. 23. As of February 8, 2008, said motion is fully briefed. Doc. No. 57. It is this motion which is currently pending before the Court and, hence, is the subject of this memorandum opinion. The Court has jurisdiction in this case pursuant to 28 U.S.C. § 1331. Venue is proper under 28 U.S.C. § 1391(b).

### III. <u>Standard of Review</u>

Summary judgment may only be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P. 56(c)*. Pursuant to Federal Rule of Civil Procedure 56(c), the Court must enter summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In evaluating the evidence, the Court must interpret the facts in the light most favorable to the non-moving party, drawing all

reasonable inferences in his or her favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007). The burden is initially on the moving party to demonstrate that the evidence contained in the record does not create a genuine issue of material fact. *Conoshenti v. Public Serv. Elec. & Gas Co.*, 364 F.3d 135, 140 (3d Cir. 2004). A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). Where the non-moving party will bear the burden of proof at trial, the moving party may meet its burden by showing that the admissible evidence contained in the record would be insufficient to carry the non-moving party's burden of proof. *Celotex*, 477 U.S. at 322. Once the moving party satisfies its burden, the burden shifts to the non-moving party, who must go beyond his or her pleadings and designate specific facts by the use of affidavits, depositions, admissions or answers to interrogatories in order to show that there is a genuine issue of material fact for trial. *Id.* at 324. The non-moving party cannot defeat a well supported motion for summary judgment by simply reasserting unsupported factual allegations contained in his or her pleadings. *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989).

IV.    **Discussion**

    A.    **Application of the Statute of Limitations**

In support of their Motion for Summary Judgment, the Defendants appear to be raising three distinct statute of limitations issues. First, they intimate that this entire action is barred by Pennsylvania's two-year statute of limitations. Doc. No. 24, pp. 2-4. Second, they argue that the claims against Depp are time-barred even if the claims against Waters can proceed. *Id.*, pp. 4-5. Third, they contend that service was improper because of Baranowski's failure to comply with Pennsylvania Rule of Civil Procedure 422. Doc. No. 48, p. 14. Since the Court is convinced that

this action is barred by the statute of limitations, the Defendants' third argument need not be addressed. The first two will be addressed together, since they are interrelated with each other.

At the outset, the Court does not agree with the Defendants' characterization of the statute of limitations issue as jurisdictional. Doc. No. 24, pp. 3-4. Federal Rule of Civil Procedure 8(c) clearly classifies the statute of limitations as an affirmative defense. *Fed. R. Civ. P. 8(c).* The Court acknowledges that the United States Court of Appeals for the Third Circuit permits a defendant to seek the dismissal of a claim on statute of limitations grounds pursuant to Federal Rule of Civil Procedure 12(b)(6) before a responsive pleading is filed. *Robinson v. Johnson*, 313 F.3d 128, 135 (3d Cir. 2002). The statute of limitations, however, remains an *affirmative defense* rather than a jurisdictional requirement. *Id.* at 135-136. Congress, of course, has the authority to make a particular statute of limitations jurisdictional. *John R. Sand & Gravel Company v. United States*, 128 S.Ct. 750, 753-755 (2008); *Arbaugh v. Y&H Corporation*, 546 U.S. 500, 514-515 (2006). Since this case does not arise under a statute containing a jurisdictional statute of limitations, the statute of limitations at issue is subject to waiver, and this Court is not free to disregard an intelligent waiver of the issue. *Day v. McDonough*, 126 S.Ct. 1675, 1684 n. 11 (2006). Defendants' belief to the contrary is in error. Doc. No. 24, pp. 3-4.[1]

---

[1] The United States Supreme Court has made it clear that the "borrowing" of a particular state's statute of limitations necessarily entails the incorporation of that state's tolling rules. *Hardin v. Straub*, 490 U.S. 536, 538-544 (1989). The Defendants may believe that the characterization of the statute of limitations as either an "affirmative defense" or a "jurisdictional" requirement is itself a question of state law. Such a question, if presented, would be complicated, given that Congress has delineated the jurisdiction of this Court to entertain an action of this kind. 28 U.S.C. § 1331. As the Supreme Court explained in *West v. Conrail*, 481 U.S. 35 (1987), only those portions of state law necessary to fill a void in federal law are borrowed. *West*, 481 U.S. at 39 ("Inevitably our resolution of cases or controversies requires us to close interstices in federal law from time to time, but when it is necessary for us to borrow a statute of limitations for a federal cause of action, we borrow no more than necessary."). The reasoning in *West* leads the Court to believe that Federal Rule of Civil Procedure 8(c)'s characterization of the statute of limitations as an affirmative defense would control in an action under 42 U.S.C. § 1983 even if a particular state were to treat its statute of limitations as jurisdictional. In any event, however, there is no need for the Court to dwell on that issue, since Pennsylvania law treats its two-year statute of limitations as an affirmative defense. *Griffin v.*

7

In this case, the Defendants have not waived the statute of limitations issue.  Instead, they appear to raise it from several different angles.  Before addressing these arguments, the Court notes that the facts relevant to the statute of limitations issue are generally not disputed by the parties. Baranowski gave the Pennsylvania State Police his "notice of retirement" on July 7, 2003.  Doc. Nos. 45, ¶ 50, 49, ¶ 50.  He realized that his job was in jeopardy by June 30, 2003.  Doc. No. 45, ¶ 47. This action was not commenced until September 30, 2005.  Doc. No. 1.  Baranowski believes that his filing of a praecipe for a writ of summons against Waters and Depp in the Court of Common Pleas of Fayette County tolled Pennsylvania's two-year statute of limitations on May 23, 2005.  Doc. Nos. 38-9, pp. 2-3, 53, p. 5.  The Defendants appear to question Baranowski's assumption, albeit in accordance with their incorrect characterization of this issue as a jurisdictional matter.  Doc. No. 24, pp. 3-4.  They also argue that the claims against Depp are barred regardless of whether this action as a whole is barred, since more than two years elapsed between his alleged retaliatory actions against Baranowski and the filing of the praecipe.  *Id.*, pp. 4-5.

Depp initiated six "Use of Force or Complaint Reception and Processing Worksheets" against Baranowski between March 3, 2003, and March 11, 2003.  Doc. Nos. 45, ¶ 40, 49, ¶ 40. Four of them were sustained by Waters on June 30, 2003.  Doc. No. 26-10, pp. 122-125.  It was on that date that Waters allegedly informed Baranowski that his job was in jeopardy.  Doc. No. 45, ¶ 47.  The allegations of misconduct lodged against Baranowski were not based on the Ellerbe

*Central Sprinkler Corporation*, 823 A.2d 191, 195 (Pa.Super.Ct. 2003)(referring to the statute of limitations as an "affirmative defense" in a personal injury action).  Consequently, there is no question that the statute of limitations operates as an affirmative defense, rather than as a jurisdictional requirement, in this case.

investigation. One allegation did, however, concern Baranowski's private investigatory work.[2] He was accused of becoming personally involved in a police brutality investigation in Uniontown for private pecuniary gain, thereby creating a conflict of interest with his duties as a police officer. Doc. Nos. 26-10, p. 122, 37-2, p. 2. Another allegation involved Baranowski's ordering of equipment without proper authorization, and his alleged lack of candor in response to subsequent inquiries about the matter. Doc. No. 26-10, p. 123. He was also accused of misappropriating a dealer's vehicle, apparently because he retained possession of it longer than necessary for the purpose of test-driving it. *Id.*, p. 125. The other allegation sustained by Waters on June 30, 2003, concerned Baranowski's alleged failure to report for duty in proper police attire. *Id.*, p. 124.

If the Court were to assume *arguendo* that the statute of limitations was tolled on May 23, 2005, the question would be whether the relevant First Amendment violations *for constructive discharge* (at least with respect to Depp) occurred when Depp initiated formal complaints against Baranowski, or whether they did not occur until Waters' affirmation of those complaints compelled Baranowski's decision to terminate his employment with the Pennsylvania State Police. In *National Railroad Passenger Corporation v. Morgan*, 536 U.S. 101 (2002), the United States Supreme Court construed the enforcement provisions contained in Title VII of the Civil Rights Act of 1964 to require the timely administrative exhaustion of each discrete violation of Title VII's substantive provisions. The relevant language construed by the Supreme Court provides: "A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment

---

[2]In their briefs, the parties discuss these complaints against Baranowski with respect to the issue of causation (i.e., whether Depp's initiation of the complaints, and Waters' sustaining of the complaints, were motivated by a desire to retaliate against Baranowski for his "speech" concerning the Ellerbe investigation). Doc. Nos. 24, pp. 5-12, 43, pp. 8-12, 48, p. 15, 53, p. 6. The Court need not focus on these arguments, since it has no occasion to consider the issue of causation.

practice occurred[.]" 42 U.S.C. § 2000e-5(e)(1). Focusing on the term "unlawful employment practice," Justice Thomas, the author of the opinion, explained:

> Discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are easy to identify. Each incident of discrimination and each retaliatory adverse employment decision constitutes a separate actionable "unlawful employment practice." Morgan can only file a charge to cover discrete acts that "occurred" within the appropriate time period.

*Morgan*, 536 U.S. at 114. Justice Thomas went on to distinguish "discrete acts" of unlawful discrimination under Title VII, which are individually actionable, from "hostile work environment" claims, which are based on the cumulative effect of acts that are not necessarily actionable in and of themselves. *Id.* at 115. Since a "hostile work environment" is itself an "unlawful employment practice," *Morgan* held that "the entire time period of the hostile work environment may be considered by a court for the purposes of determining liability" even if "some of the component acts of the hostile work environment fall outside the statutory time period." *Id.* at 117.

In *O'Connor v. City of Newark*, 440 F.3d 125 (3d Cir. 2006), the United States Court of Appeals for the Third Circuit held that the distinction recognized in *Morgan* between "discrete acts" and so-called "continuing violations" is "a generic feature of federal employment law" rather than "an artifact of Title VII." *O'Connor*, 440 F.3d at 128. The Court of Appeals declared:

> The principles at work in *Morgan* apply with equal force to § 1983 claims. *Morgan* held simply that causes of action that can be brought individually expire with the applicable limitations period. By contrast, the "hostile work environment" theory is designed explicitly to address situations in which the plaintiff's claim is based on the cumulative effect of a thousand cuts, rather than on any particular action taken by the defendant. In such cases, obviously the filing clock cannot begin running with the first act, because at that point the plaintiff has no claim; nor can a claim expire as to that first act, because the full course of conduct is the actionable infringement. *Morgan*, 536 U.S. at 117-18. The Court did nothing more than to restate, in the employment discrimination context, the common-sense proposition that an applicable

statute of limitations begins to run at the time the claim accrues, and that time-barred claims cannot be resurrected by being aggregated and labeled continuing violations.

*Id.* at 128-129. Hence, the Court must view the statute of limitations issue in this case through the prism of the Supreme Court's analysis in *Morgan*.

The application of *Morgan* in a § 1983 case such as this is problematic for three reasons. First of all, the Supreme Court's analysis was firmly embedded within the statutory language of Title VII's enforcement provision. *Morgan*, 536 U.S. at 109-122 (construing 42 U.S.C. § 2000e-5(e)(1)). Neither the Constitution nor § 1983 contains a relevant analogue to that statutory language. Second, it is unclear whether a "constructive discharge" (as opposed to an actual discharge) constitutes a "discrete act" for purposes of the limitations period, or whether it is more amenable to a "continuing violation" analysis akin to that employed in the "hostile work environment" context. *Hazel v. Laborers' Health & Safety Fund of North America*, 478 F.3d 364, 370 (D.C.Cir. 2007)(noting that it is an open question whether constructive discharge claims should be categorized as "continuing violations" claims). The question is complicated by the fact that most "constructive discharges" are *caused by* "hostile work environments," making it difficult to separate the two kinds of cases for purposes of the *Morgan* analysis. *Pennsylvania State Police v. Suders*, 542 U.S. 129, 143-152 (2004). The United States Court of Appeals for the Third Circuit recognizes constructive discharges as actionable in the "First Amendment retaliation" context. *Hill v. Borough of Kutztown*, 455 F.3d 225, 239-243 (3d Cir. 2006). Moreover, Baranowski clearly bases his claims in this case on such a constructive discharge theory. Doc. No. 1, ¶¶ 10-11. Finally, if the Court were to assume *arguendo* that a constructive discharge (like an actual discharge) constitutes a "discrete act" for purposes of *Morgan*, it is unclear *when* Depp (as opposed to Waters) constructively *discharged*

Baranowski.[3] *Morgan*, 536 U.S. at 114, n. 7 ("There may be circumstances where it will be difficult to determine when the time period should begin to run. One issue that may arise in such circumstances is whether the time begins to run when the *injury* occurs as opposed to when the injury reasonably should have been discovered.")(emphasis added); *Scott v. Lee County Youth Development Center*, 232 F.Supp.2d 1289, 1295 (M.D.Ala. 2002)(concluding that the applicable limitations period in a constructive discharge case is measured from the date on which the employee gives notice of his or her intention to resign).

The parties have focused their arguments concerning the statute of limitations issue on the application of *Morgan* and *O'Connor* in this case rather than on the broader question of whether this entire action is time-barred.[4] Doc. Nos. 24, pp. 2-5, 43, pp. 12-14, 48, p. 15. Nevertheless, the Court need not decide how the *Morgan* framework should be applied to Depp's initiation of formal complaints against Baranowski outside of the limitations period, which supposedly resulted in Baranowski's constructive discharge inside of the limitations period. It is unnecessary for the Court to reach this nuanced procedural dispute, since the Court is convinced that Baranowski's filing of

---

[3]The Defendants argue that Baranowski's decision to terminate his employment with the Pennsylvania State Police did not constitute a "constructive discharge." Doc. No. 24, pp. 19-20. The Court need not reach that issue because the Defendants are entitled to summary judgment even if Baranowski was constructively discharged. Thus, for purposes of this case, the Court assumes *arguendo* that Baranowski's "retirement" constituted a constructive discharge.

[4]The Court understands the Supreme Court's decision in *Day v. McDonough*, 126 S.Ct. 1675 (2006), to mean that, absent an intelligent waiver of the statute of limitations issue on the part of a defendant, a federal court may dismiss an action as untimely even if the grounds relied upon for doing so are slightly different than those directly advanced in the defendant's brief. *Day*, 126 S.Ct. at 1679-1685. It is clear that the Defendants have not waived the statute of limitations issue in this case. Doc. No. 24, pp. 2-5. The Court disagrees with the Defendants' characterization of this matter as a jurisdictional issue. *Id.* Nevertheless, the issue has been raised by the Defendants, and Baranowski has now briefed the question of whether this entire action is time-barred. Doc. No. 43, pp. 12-13. The Court finds his arguments to be unpersuasive, especially since his argument as to this issue ends with his observation that Pennsylvania's tolling rule would apply if this case had been removed pursuant to 28 U.S.C. § 1441. *Id.*, p. 13. This is not a *removed* case. Baranowski commenced a new action in this Court.

the praecipe did not toll the statute of limitations in any event. Therefore, for purposes of this case, the Court assumes *arguendo* that the relevant date of the alleged constitutional violations (with respect to both Waters and Depp) is July 7, 2003.

Relevant to this issue is 42 U.S.C. § 1988(a), which provides:

**§ 1988. Proceedings in vindication of civil rights**
**(a) Applicability of statutory and common law.** The jurisdiction in civil and criminal matters conferred on the district and circuit courts [district courts] by the provisions of this Title, and of Title "CIVIL RIGHTS," and of Title "CRIMES," for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause, and, if it is of a criminal nature, in the infliction of punishment on the party found guilty.

42 U.S.C. § 1988(a). The Supreme Court has construed this language to mean that, in the absence of an explicit federal statute of limitations applicable to the particular claim at issue, "the length of the limitations period, and closely related questions of tolling and application, are to be governed by state law."[5] *Wilson v. Garcia*, 471 U.S. 261, 269 (1985)(footnote omitted).          In an action

---

[5] Concerned that federal courts were wasting time trying to determine the applicable statutes of limitations for federal causes of action, Congress enacted a four-year statute of limitations as a default for federal causes of action which do not have explicit statutes of limitations of their own. Pub. L. No. 101-650, § 313, 104 Stat. 5089, 5114-5115 (1990). This default statute of limitations is codified at 28 U.S.C. § 1658(a). This federal limitations period, however, applies only to civil actions "arising under an Act of Congress enacted after" December 1, 1990. 28 U.S.C. § 1658(a). In *Jones v. R.R. Donnelley & Sons Company*, 541 U.S. 369, 382 (2004), the Supreme Court held that "a cause of action 'aris[es] under an Act of Congress enacted' after December 1, 1990–and therefore is governed by § 1658's 4-year statute of limitations–if the plaintiff's claim against the defendant was made possible by a post-1990 enactment." In so holding, the Supreme Court rejected the argument that only a claim based on "a new, stand-alone statute" was governed by § 1658. *Jones*, 541 U.S. at 381. Nonetheless, § 1658 is not applicable in this case, since Baranowski's claims are based on the United States Constitution and 42 U.S.C. § 1983, both of which were in existence long before December 1, 1990. Claims of the kind asserted by Baranowski were actionable under

brought under § 1983, the applicable statute of limitations is the particular state's limitations period for personal injury actions. *Id.* at 276-280. Pennsylvania's limitations period is two years. 42 Pa.C.S. § 5524(2), (7).[6]

This Court must look to Pennsylvania law in order to determine whether the conditions for tolling have been met. *Callwood v. Questel*, 883 F.2d 272, 274-275 (3d Cir. 1987). It is axiomatic that the "borrowing" of a state's statute of limitations also entails the incorporation of that state's tolling rules. *Hardin v. Straub*, 490 U.S. 536, 538-544 (1989). Pennsylvania Rule of Civil Procedure provides:

> **Rule 1007.  Commencement of Action**
> An action may be commenced by filing with the prothonotary
> (1) a praecipe for a writ of summons, or
> (2) a complaint.

*Pa. R. Civ. P. 1007.* Hence, under Pennsylvania law, Baranowski's filing of a praecipe against the Defendants constituted the commencement of an action in the Court of Common Pleas of Fayette County. Doc. No. 38-9, pp. 2-3. As far as the Court can tell, no further action was taken by Baranowski with respect to the proceedings in the Court of Common Pleas. Doc. No. 24, p. 2. The praecipe was apparently filed only for the purpose of tolling Pennsylvania's two-year statute of limitations. Doc. No. 43, p. 12.

In support of his argument that the filing of the praecipe tolled the statute of limitations

---

§ 1983 before 1990. Hence, Pennsylvania's two-year statute of limitations must be "borrowed" in this case. 42 Pa.C.S. § 5524.

[6]Subsection 2 establishes a two-year statute of limitations for actions "to recover damages for injuries to the person or for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another." 42 Pa.C.S. § 5524(2). Subsection 7 likewise establishes a two-year statute of limitations for other actions or proceedings "to recover damages for injury to person or property which is founded on negligent, intentional, or otherwise tortious conduct . . ." 42 Pa.C.S. § 5524(7).

applicable to his claims, Baranowski points out that Pennsylvania's rules governing the commencement of an action apply in cases removed to this Court. *Id.*, p. 13. The Court does not disagree with this assertion. *Heater v. Kidspeace*, 2005 WL 2456008, at *2, 2005 U.S. Dist. LEXIS 22512, at *5 (E.D.Pa. October 5, 2005)(noting that Pennsylvania Rule of Civil Procedure 1007 applies to cases removed to federal court after having been commenced in a Pennsylvania court). The problem with Baranowski's argument, however, is that it begs the question. This case was not *removed* from the Court of Common Pleas of Fayette County pursuant to 28 U.S.C. § 1441. Instead, it was *commenced* in this Court on September 30, 2005, when Baranowski filed a complaint against the Defendants in accordance with Federal Rule of Civil Procedure 3. Doc. No. 1. What Baranowski essentially did was commence two separate actions against the Defendants. The action in the Court of Common Pleas, it is conceded, was commenced in a timely manner. Doc. No. 48, p. 14. This action, of course, was not commenced until after the running of the statute of limitations, assuming that the limitations period was not tolled (for purposes of this action) when the praecipe was filed. This situation is not unlike that addressed by the Supreme Court in *Board of Regents v. Tomanio*, 446 U.S. 478 (1980). In that decision, speaking through Justice Rehnquist, the Supreme Court made it clear that, in § 1983 actions, state statutes of limitations "are binding rules of law." *Tomanio*, 446 U.S. at 484. Since New York law did not provide for the tolling of a cause of action "during the period in which a litigant pursue[d] a related, but independent cause of action[,]" the Supreme Court determined that New York's statute of limitations barred a subsequent action in federal court despite the fact that the plaintiff had diligently proceeded with a related action in a New York court. *Id.* at 486. Under *Tomanio*, this Court must look to the law of Pennsylvania to determine whether Baranowski's commencement of an action in the Court of Common Pleas tolled

the statute of limitations with respect to this separate action. *Id.* at 487 ("The New York Legislature has apparently determined that the policies of repose underlying the statute of limitations should not be displaced by whatever advantages inure, whether to the plaintiff or the system, in a scheme which encourages the litigation of one cause of action prior to another.").

Baranowski appears to believe that once the statute of limitations is tolled by the commencement of one action, it is likewise tolled for purposes of other related actions. Doc. Nos. 43, p. 12, 53, p. 5. That is not necessarily true. In *Stinson v. Kaiser Gypsum Company, Inc.*, 972 F.2d 59 (3d Cir. 1992), the United States Court of Appeals for the Third Circuit observed that the commencement of one action does not automatically toll Pennsylvania's two-year statute of limitations for purposes of a later action. *Stinson*, 972 F.2d at 62 ("While a timely filed complaint or praecipe for writ of summons satisfies the statute of limitations under Pennsylvania law as far as *that* action is concerned, the Pennsylvania rule as to *new* actions is the same as the generally accepted rule.")(emphasis added). Under Pennsylvania law, if a timely filed action is dismissed after the limitations period has run, "a new action on the same claim is time barred unless a limitations savings statute provides otherwise." *Id.* at 62. Thus, Pennsylvania law recognizes a distinction between the action commenced by Baranowski in the Court of Common Pleas and the action commenced by him in this Court. This distinction has been recognized as a basis for holding that an action commenced in a Pennsylvania court does not toll the statute of limitations with respect to a subsequent action commenced in a federal court. *Ammlung v. City of Chester*, 494 F.2d 811, 816 (3d Cir. 1974)("The running of a Pennsylvania statute of limitations against a federal cause of action is not tolled under Pennsylvania concepts of tolling by the commencement of a similar suit in state court."); *Ravitch v. Price Waterhouse*, 793 A.2d 939, 942 (Pa.Super.Ct. 2002)("Nor does the filing

of an action in state court toll the statute of limitations against a subsequent action filed in federal court."). It is undisputed that this action was not commenced until after the running of the statute of limitations (assuming that the limitations period was not tolled). Doc. No. 43, pp. 12-13. Consequently, this action is presumptively time-barred. The relevant question is whether Pennsylvania's "limitations savings statute provides otherwise." *Stinson*, 972 F.2d at 62.

Pennsylvania has codified specific rules governing the effect that the commencement of one action has on the statutes of limitations in related actions. 42 Pa.C.S. § 5535. The statutory language provides:

> **§ 5535. Effect of other actions and proceedings**
> **(a) Termination of prior matter.--**
> (1) If a civil action or proceeding is timely commenced and is terminated, a party, or his successor in interest, may, notwithstanding any other provision of this subchapter, commence a new action or proceeding upon the same cause of action within one year after the termination and any other party may interpose any defense or claim which might have been interposed in the original action or proceeding.
> (2) Paragraph (1) does not apply to:
> (i) An action to recover damages for injury to the person or for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another.
> (ii) An action or proceeding terminated by a voluntary nonsuit, a discontinuance, a dismissal for neglect to prosecute the action or proceeding, or a final judgment upon the merits.

42 Pa.C.S. § 5535(a).[7] As noted earlier, the action commenced by Baranowski in the Court of Common Pleas has apparently remained idle since the filing of the praecipe. No allegation is made

---

[7]Subsection (b) provides that "[w]here the commencement of a civil action or proceeding has been stayed by a court or by statutory prohibition, the duration of the stay is not a part of the time within which the action or proceeding must be commenced." 42 Pa.C.S. § 5535(b). Since there was no stay which interfered with Baranowski's ability to bring this action, this statutory provision is inapplicable to this case. The same is true of Subsection (c), which provides for tolling during the time between a demand for arbitration and a subsequent determination by a court that no obligation to arbitrate exists. 42 Pa.C.S. § 5535(c). Baranowski does not contend that there was an impediment to his filing of this action in a timely manner. Therefore, only Subsection (a) is relevant to this case.

that it has been "terminated" within the meaning of 42 Pa.C.S. § 5535(a). As far as the Court can tell, it is still pending. The savings statute is operative only "[i]f a civil action is timely commenced *and is terminated*[.]" 42 Pa.C.S. § 5535(a)(1). Thus, Baranowski has failed to satisfy a statutory prerequisite for the otherwise untimely commencement of a new action (i.e., the termination of the previous action).

Even if the Court were to assume *arguendo* that Baranowski's action in the Court of Common Pleas has been "terminated" within the meaning of § 5535(a)(1), this action would nevertheless be barred by the statute of limitations. Under § 5535(a)(2)(i), personal injury actions are expressly excluded from the category of cases which may be "saved" from the running of the limitations period. *Stinson*, 972 F.2d at 63 (construing Pennsylvania's savings statute to exclude "personal injury actions" from the general rule that where an action is dismissed "for a reason unrelated to the merits, limitations will not bar a new suit instituted by the plaintiff within a year"). This action is subject to § 5524's two-year statute of limitations precisely because it (like all § 1983 actions) has been categorized by the Supreme Court as a personal injury action for purposes of the statute of limitations. *Wilson*, 471 U.S. at 276-280. Since § 5535(a)(2)(i) would bar an untimely filed, second personal injury action in a Pennsylvania court, it bars this § 1983 action as well.

The Court acknowledges that § 5535(a)(2)(i) appears to exclude from the savings provision only actions governed by § 5524(2), which establishes a two-year statute of limitations for "[a]n action to recover damages for injuries to the person or for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another." 42 Pa.C.S. §§ 5524(2), 5535(a)(2)(i). It does not specifically exclude actions governed by § 5524(7), which likewise establishes a two-year statute of limitations for "[a]ny other action or proceeding to recover damages

for injury to person or property which is founded on negligent, intentional, or otherwise tortious conduct or any other action or proceeding sounding in trespass, including deceit or fraud, except an action or proceeding subject to another limitation specified in this subchapter." 42 Pa.C.S. § 5524(7). A few months after the Supreme Court decided, in *Wilson v. Garcia*, 471 U.S. 261, 276-280 (1985), that § 1983 actions were subject to the particular state's statute of limitations for personal injury actions, the United States Court of Appeals for the Third Circuit held, in *Smith v. City of Pittsburgh*, 764 F.2d 188, 194 (3d Cir. 1985), that the applicable statute of limitations for § 1983 actions in Pennsylvania was the two-year limitations period established by §§ 5524(2) and 5524(7). There was no need for the Court of Appeals to distinguish between the two subsections, since the limitations period was the same for both. *Smith*, 764 F.2d at 194 (relying on both §§ 5524(2) and 5524(7) to hold that § 1983 actions in Pennsylvania were subject to a two-year statute of limitations).

While there is some support for the proposition that § 1983 actions in Pennsylvania are governed by § 5524(7), it cannot be doubted that § 5524(2) has also been cited as a basis for applying a two-year limitations period in § 1983 actions. *Bartholomew v. Fischl*, 782 F.2d 1148, 1155 (3d Cir. 1986). Section 5524(7) governs both personal injury actions and property interference actions, whereas § 5524(2) only governs actions for personal injuries. 42 Pa.C.S. § 5524(2), (7). Consequently, the most logical construction of § 5535(a)(2)(i) is that personal injury actions are excluded from the savings provision, while actions for property interference are not. Since § 1983 actions (as a matter of federal law) are characterized as personal injury actions, they are excluded from the savings provision contained in § 5535(a)(1). *Wilson*, 471 U.S. at 268-280 (holding that, as a matter of federal law, § 1983 actions were to be characterized as personal injury actions). This

construction of § 5535(a)(2)(i) is not only the most reasonable interpretation of the statutory language, but is also supported by precedent. Referring to Pennsylvania's savings statute in *Stinson*, the Court of Appeals explained:

> That statute reflects a legislative determination of the Commonwealth's policy regarding limitations when a suit is dismissed. It provides that in most instances where the dismissal is for a reason unrelated to the merits, limitations will not bar a new suit instituted by the plaintiff within a year. Personal injury actions, however, are specifically excluded.

*Stinson*, 972 F.2d at 63. It appears that the Pennsylvania Legislature intended to exclude personal injury actions from the savings provision while leaving actions for property interference subject to that provision.

Even if the foregoing analysis were not sufficient to render Baranowski's action time-barred, he would face yet another hurdle. Section 5535(a)(2)(ii) excludes from the savings provision any action dismissed for want of prosecution. 42 Pa.C.S. § 5535(a)(2)(ii); *Stinson*, 972 F.2d at 63 (recognizing suits "dismissed for want of prosecution" as excluded from the savings provision). The statutory scheme evinces a legislative intent to preclude plaintiffs who fail to prosecute a timely commenced action from reaping the benefits of the savings statute. As noted earlier, Baranowski has apparently failed to prosecute his action in the Court of Common Pleas of Fayette County. Thus, even if his earlier action had been "terminated," he would not be able to rely on the savings statute to proceed with his claims in this Court. This Court is, after all, bound by the applicable Pennsylvania statutory provisions concerning the statute of limitations and tolling. *Chardon v. Soto*, 462 U.S. 650, 651-662 (1983); *Tomanio*, 446 U.S. at 484-492. Baranowski's action falls within both categories of cases specifically excluded from Pennsylvania's savings statute. 42 Pa.C.S. §

5535(a)(2)(i)-(ii); *Stinson*, 972 F.2d at 63.

This Court's conclusion is buttressed by the analysis employed by the United States District Court for the Eastern District of Pennsylvania in *Morris v. Hoffa*, 2002 WL 524037, 2002 U.S. Dist. LEXIS 5975 (E.D.Pa. April 8, 2002). In *Morris*, the District Court declared:

> The filing of the state court action tolled the limitations period for that action alone. If the state court action were properly removed, then the filing of the action in state court would have sufficed to toll the limitations period. See *Patterson v. American Bosch Corp.*, 914 F.2d 384, 386 (3d Cir. 1990)(applying Pennsylvania law in a diversity action which was removed to federal court, and holding that the filing of a writ and good-faith attempt to serve the writ tolled the limitations period). However, the state court action is still pending, and cannot be relied on by Plaintiffs in this action.

*Morris*, 2002 WL 524037, at *3, 2002 U.S. Dist. LEXIS 5975, at *9-10. Where federal and state courts enjoy concurrent jurisdiction, a plaintiff such as Baranowski is free to commence separate actions in federal and state court. *Jinks v. Richland County*, 538 U.S. 456, 463-464 (2003). It does not follow, however, that the filing of one action necessarily tolls the period of limitations for the other. In some instances, tolling does occur. Congress has provided for the tolling of the limitations periods for state claims pending in federal court pursuant to the supplemental jurisdiction statute, thereby enabling plaintiffs to pursue such claims in a federal forum without fear of being time-barred in a subsequent state-court action if the federal court declines to exercise supplemental jurisdiction over such claims. 28 U.S.C. § 1367(d). Nevertheless, "[t]he running of a Pennsylvania statute of limitations against a federal cause of action is not tolled under Pennsylvania concepts of tolling by the commencement of a similar suit in state court." *Ammlung*, 494 F.2d at 816; see also *Jewelcor, Inc. v. Karfunkel*, ___ F.3d ___, 2008 WL 351696, at *2, 2008 U.S. App. LEXIS 2968, at *5 (3d Cir. February 11, 2008)(citing decisions of Pennsylvania courts for the proposition that an action in a

Pennsylvania court does not toll the running of the statute of limitations against a subsequent action in a federal court).

Baranowski cites to no authority to support his position that a nonremoved action in a Pennsylvania court tolls the statute of limitations applicable to a subsequent federal action, and the authority discovered by the Court flatly contradicts his position. *Ravitch*, 793 A.2d at 942; *Maxwell Downs, Inc. v. City of Philadelphia*, 638 A.2d 473, 476 (Pa.Commw.Ct. 1994); *Royal-Globe Insurance Companies v. Hauck Manufacturing Company*, 335 A.2d 460, 462 (Pa.Super.Ct. 1975). There is no basis for concluding that Baranowski's commencement of a related action in a Pennsylvania court somehow tolled the two-year statute of limitations applicable to his § 1983 action in this Court. Accordingly, this action is barred by the statute of limitations.

**B.      The Merits of Baranowski's First Amendment Claims**

The Court's resolution of the statute of limitations issue in favor of the Defendants is sufficient to dispose of this case. Nonetheless, the Defendants would still be entitled to summary judgment even if Baranowski had commenced this action in a timely manner. The evidence contained in the record cannot support a determination that the Defendants violated Baranowski's rights under the First and Fourteenth Amendments.

Baranowski brings his claims against Waters and Depp pursuant to 42 U.S.C. § 1983, which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial

> capacity, injunctive relief shall not be granted unless a declaratory decree was
> violated or declaratory relief was unavailable. For purposes of this section, any Act
> of Congress applicable exclusively to the District of Columbia shall be considered
> to be a statute of the District of Columbia.

42 U.S.C. § 1983. This statute does not create substantive rights. *Maher v. Gagne*, 448 U.S. 122,

129, n. 11 (1980). Consequently, a plaintiff cannot prevail in an action brought under § 1983

without establishing an underlying violation of federal law. *Collins v. City of Harker Heights*, 503

U.S. 115, 119 (1992)("Although the statute provides the citizen with an effective remedy against

those abuses of state power that violate federal law, it does not provide a remedy for abuses that do

not violate federal law[.]"). "Section 1983 itself contains no state-of-mind requirement independent

of that necessary to state a violation of the underlying federal right." *Board of County*

*Commissioners v. Brown*, 520 U.S. 397, 405 (1997)(internal quotation marks omitted).

The federal rights upon which Baranowski bases his claims in this case come from the First

Amendment to the United States Constitution. The First Amendment provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting
> the free exercise thereof; or abridging the freedom of speech, or of the press, or the
> right of the people peaceably to assemble, and to petition the Government for a
> redress of grievances.

U.S. CONST. amend. I. The provisions of the First Amendment are applicable to state actors

because of their incorporation within the Due Process Clause of the Fourteenth Amendment. *Locke*

*v. Davey*, 540 U.S. 712, 718 (2004). As state actors, Waters and Depp were subject to the

prohibitions contained in the First and Fourteenth Amendments at all times relevant to this case.

For many years, it was unchallenged dogma that a public employee had no constitutional

right to object to conditions placed on his or her employment, even where such conditions included

restrictions on the employee's exercise of a constitutional right. *Adler v. Board of Education*, 342 U.S. 485, 492 (1952)("They may work for the school system upon the reasonable terms laid down by the proper authorities of New York. If they do not choose to work on such terms, they are at liberty to retain their beliefs and associations and go elsewhere."). In more recent times, however, the United States Supreme Court has held that "the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 126 S.Ct. 1951, 1957 (2006). In determining whether a retaliatory action taken against a public employee by a governmental actor comports with the requirements of the Free Speech Clause, the Court must keep in mind that "[t]he government's interest in achieving its goals as effectively and efficiently as possible is elevated from a relatively subordinate interest when it acts as sovereign to a significant one when it acts as employer." *Waters v. Churchill*, 511 U.S. 661, 675 (1994)(plurality opinion). For this reason, the constitutionality of discipline imposed by a public employer on its employees does not turn solely on the standards applicable to speech restrictions imposed by the government on members of the general population. *City of San Diego v. Roe*, 543 U.S. 77, 80 (2004)(explaining that a governmental entity may constitutionally impose restraints on the speech of its employees "that would be unconstitutional if applied to the general public").

The general test employed by courts to test the constitutionality of public employer discipline in retaliation for speech protected under the Free Speech Clause was established by the Supreme Court in *Pickering v. Board of Education*, 391 U.S. 563 (1968). In *Pickering*, speaking through Justice Marshall, the Supreme Court explained:

> "The theory that public employment which may be denied altogether may be subjected to any conditions, regardless of how unreasonable, has been uniformly rejected." *Keyishian v. Board of Regents*, [385 U.S. 589, 605-606 (1967)]. At the

> same time it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.

*Pickering*, 391 U.S. at 568. Given the language in *Pickering*, it is clear that a public employee's right to be free from employer discipline in retaliation for speech must be grounded in the employee's interest *as a citizen* in speaking about matters of *public concern*. It is *this* interest which must be balanced against the employer's interest in "promoting the efficiency of the public services it performs through its employees." *Id.* Where a public employee does not speak *as a citizen* about matters of *public concern*, there is nothing to balance against the government's interest in the efficiency of the services that it performs through its employees. *Connick v. Myers*, 461 U.S. 138, 147 (1983)("We hold only that when a public employee speaks not as a citizen upon matters of public concern, but instead as an employee upon matters only of personal interest, absent the most unusual circumstances, a federal court is not the appropriate forum in which to review the wisdom of a personnel decision taken by a public agency allegedly in reaction to the employee's behavior."); *Roe*, 543 U.S. at 82 ("*Pickering* did not hold that any and all statements by a public employee are entitled to balancing. To require *Pickering* balancing in every case where speech by a public employee is at issue, no matter the content of the speech, could compromise the proper functioning of government offices.").

If it is determined that a public employee has spoken as a citizen about matters of public concern, and that his or her interest in doing so outweighed the government's interest in workplace

efficiency, the employee must establish causation between his or her speech and the relevant retaliatory action in order to prevail in an action against his or her employer. In *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274 (1977), the Supreme Court declared:

> A borderline or marginal candidate should not have the employment question resolved against him because of constitutionally protected conduct. But that same candidate ought not to be able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision.

*Doyle*, 429 U.S. at 286. In order to establish causation, a public employee asserting a First Amendment retaliation claim against his or her employer must first establish that his or her constitutionally protected speech was a *substantial* or *motivating* factor behind the challenged retaliatory action.[8] *Id.* at 287. If the public employee makes such a showing, the burden shifts to the public employer to establish by a preponderance of the evidence that it would have reached the same decision (or taken the same action) even in the absence of the employee's constitutionally protected speech. *Id.* The issue of causation presents a question of fact for the jury. *Baldassare v. New Jersey*, 250 F.3d 188, 195 (3d Cir. 2001).

Before proceeding to balance Baranowski's interest in expressing his views about the Ellerbe shooting against the Pennsylvania State Police's interest in maintaining workplace efficiency, the

---

[8]The Court's use of the word "protected" should be read in its proper context. The mere fact that a category of speech (i.e., speech by a public employee about matters of purely private concern) may not entitle a public employee to constitutional protection from employer discipline does not mean that the same category of speech enjoys no constitutional protection at all. As the Supreme Court noted in *Connick v. Myers*, 461 U.S. 138, 147 (1983), "an employee's false criticism of his employer on grounds not of public concern may be cause for his discharge but would be entitled to the same protection in a libel action accorded an identical statement made by a man on the street." Hence, it is clear that public employers may sometimes discipline or discharge public employees for engaging in speech which otherwise enjoys First Amendment protection. *City of San Diego v. Roe*, 543 U.S. 77, 80-85 (2004)(explaining that a police officer had no constitutional protection from employer discipline for selling sexually explicit videotapes of himself in his police uniform).

Court must determine whether Baranowski is entitled to *Pickering* balancing in the first place. As noted earlier, he is entitled to such balancing only if he spoke *both* as a citizen *and* about a matter of public concern. *Pickering*, 391 U.S. at 568 ("The problem in any case is to arrive at a balance between the interests of the teacher, *as a citizen*, in commenting upon matters of *public concern* and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.")(emphasis added). The question of whether a public employee has spoken "as a citizen" centers on the distinction between speech in his or her private capacity and speech pursuant to his or her official duties. In *Garcetti v. Ceballos*, 126 S.Ct. 1951 (2006), the Supreme Court held that the First Amendment does not protect public employees from discipline for expressions made pursuant to their official duties. Justice Kennedy, who delivered the opinion of the Court, explained that "[e]mployees who make public statements outside the course of performing their official duties retain some possibility of First Amendment protection because that is the kind of activity engaged in by citizens who do not work for the government." *Garcetti*, 126 S.Ct. at 1961. He went on to say that when public employees speak pursuant to their employment responsibilities, "there is no relevant analogue to speech by citizens who are not government employees." *Id.* The question of whether a public employee's speech constitutes speech "as a citizen," rather than speech pursuant to his or her official duties, is a mixed question of law and fact. *Foraker v. Chaffinch*, 501 F.3d 231, 240 (3d Cir. 2007). The question of whether the particular speech at issue involves a matter of public concern is a question of law for the Court. *Baldassare*, 250 F.3d at 195. The *Pickering* balancing test itself, where applicable, is likewise performed by the Court, since the determination of whether a public employee's interest in speaking outweighs his or her employer's interest in workplace efficiency is a question of law. *San Filippo v. Bongiovanni*, 30 F.3d 424, 434,

n. 11 (3d Cir. 1994).

In his deposition, Baranowski testified that, as the senior ranking officer at the scene of the Ellerbe shooting, he was the "incident commander." Doc. No. 26-9, p. 8. He completed a Homicide Investigation Action Report ("Report") on December 27, 2002. Doc. No. 26-10, pp. 12-17. He was also interviewed by Sergeant Calvin Andrews, a member of the Pennsylvania State Police's Bureau of Professional Responsibility, on March 19, 2003.[9] Doc. No. 50-2, pp. 2-3, ¶ 2. Both the Report and the interview describe the version of events relayed to Baranowski by Nassan and Curry. Having reviewed both the Report and the interview transcript, the Court understands the events described by Nassan and Curry to be that the two officers were chasing Ellerbe, who was running away from a reportedly stolen vehicle, near a fence. Doc. Nos. 26-10, p. 12, 50-2, p. 9. Curry apparently slipped on the fence and fell to the ground, inadvertently causing his gun to discharge. *Id.* Seeing Curry on the ground after hearing gunfire, Nassan mistakenly believed that Ellerbe had shot Curry. *Id.* Nassan proceeded to order Ellerbe to take his hands out of his pockets, but Ellerbe refused. *Id.* Nassan then shot Ellerbe, believing him to be armed. *Id.*[10]

Baranowski testified that the physical evidence was inconsistent with the version of events described by Nassan and Curry. In his view, the "shell casings" were not where they would have been had the shooting actually occurred in the manner described by the two officers. Doc. No. 26-9, p. 19. He also found no "powder residue" in the areas where he expected it to be. *Id.* Baranowski opined that had the events unfolded according to the story told by Nassan and Curry, powder residue

[9]According to the affidavit of Calvin Andrews, the entity formerly called the Bureau of Professional Responsibility is now known as the Bureau of Integrity and Professional Standards. Doc. No. 50-2, pp. 2-3, ¶ 2. The Court refers to it as it was known during the relevant period of time.

[10]The Court notes that its review of the facts related to the Ellerbe incident is limited to the evidence set forth by the parties.

would have been on both the fence line and Curry's body. *Id.* He indicated that Curry's gun would have been in close proximity to his body if it had discharged during a fall, leaving powder residue on Curry's body. *Id.*, p. 20. Baranowski further testified that he had found the shell casings to be in close proximity to each other, which was inconsistent with one shooter standing behind the fence and the other shooter falling off of the fence. *Id.*, p. 37.

This case, of course, does not turn on the precise circumstances of the Ellerbe shooting. Instead, it concerns only the nature of Baranowski's speech, and the capacity in which he engaged in such speech. The "speech" at issue includes two conversations that he allegedly had with Depp and one conversation that he allegedly had with Waters. According to Baranowski's testimony, he first spoke with Depp about the Ellerbe investigation on February 12, 2003. Doc. No. 34-2, ¶ 7. This conversation occurred in the Uniontown barracks. *Id.* Depp allegedly called Baranowski into his office to discuss the Ellerbe shooting because Baranowski had just discussed the matter with Federal Bureau of Investigation ("FBI") personnel. *Id.* When Baranowski informed Depp of his view that the shooting had not occurred in the manner described by Nassan and Curry, Depp told him that he was not a part of the investigation, and that he should not become involved with it. Doc. No. 26-9, p. 18. Baranowski perceived Depp's demeanor to be hostile. *Id.*, p. 21. This allegedly hostile tone from Depp apparently deterred Baranowski from discussing the incident further, since he believed that he would be putting himself in harm's way if he persisted with his misgivings about the investigation. *Id.*, p. 41. Although he did not specifically state that the Pennsylvania State Police was attempting to cover up the truth about the shooting, he believed that his expressed reservations about the investigation had implied such a "logical conclusion." *Id.*, p. 40. Baranowski testified that no third parties witnessed this conversation. *Id.*, p. 22. Moreover, he explained that he never put

his concerns about the shooting in writing because Depp had warned him to stay out of the investigation. *Id.*, p. 40.

Aside from his police duties, Baranowski earned money working as a freelance investigator. *Id.*, p. 50. His private business is known as James Baranowski & Associates. *Id.*, p. 51. Between 2003 and the date of his deposition (June 25, 2007), Baranowski earned approximately $30,000.00 through his private investigative business. *Id.* It was this business which allegedly led to Baranowski's second conversation with Depp about the Ellerbe shooting. This conversation is alleged to have occurred on February 17, 2003. Doc. No. 34-2, ¶ 8. According to Baranowski's deposition testimony, Depp called him into the Uniontown office and indicated that a rumor had surfaced about a state trooper working as a private investigator for Ellerbe's family. Doc. No. 26-9, p. 26. Baranowski understood Depp's comment as an accusation that he was himself working in that capacity. *Id.*, p. 27. Displeased that Depp was accusing him of assuming private investigative duties which created a conflict of interest with his police work, Baranowski denied that he was working for Ellerbe's family. *Id.*, p. 26. Depp allegedly told Baranowski that there would be "severe repercussions or consequences" if he were found to be providing such assistance to Ellerbe's family through Baranowski & Associates. *Id.*

Depp's testimony clearly contradicts that of Baranowski. Depp denied that he had ever discussed the Ellerbe shooting with Baranowski. Doc. No. 35-4, pp. 11-12. In fact, he testified that he had been unaware of Baranowski's misgivings about the version of events described by Nassan and Curry. *Id.*, p. 12. Depp explained that he had been somewhat interested in learning more about the Ellerbe shooting because of his friendship with Curry. *Id.*, p. 7. He was apparently good friends

with an individual named DX Smith, whose daughter had given birth to Curry's child.[11]  *Id.*, p. 9.

Depp further stated that he and Curry occasionally drank beer together in Uniontown.  *Id.*  It was this

"personal" interest, rather than a professional interest, which apparently drew Depp's attention to

the investigation.  *Id.*, p. 7.  Waters testified that Depp "may have" informed him that Baranowski

doubted the version of events described by Nassan and Curry.  Doc. No. 36-2, p. 23.  He could not

recall whether Depp had expressed to him a suspicion that Baranowski was assisting Ellerbe's family

as a private investigator.  *Id.*

Baranowski testified that he had spoken with Waters about the Ellerbe investigation during

the third week of February 2003.  Doc. No. 26-9, p. 14.  The topic apparently came up when

Baranowski and Waters were discussing other matters.  *Id.*, p. 34.  Baranowski told Waters that he

did not believe that the shooting had occurred as described by Nassan and Curry.  *Id.*  They allegedly

discussed the public perception of the incident, and the hostility that some members of the public

had exhibited toward police officers.  *Id.*  According to Baranowski, Waters never indicated that his

expression of such misgivings was inappropriate or improper.  *Id.*, p. 35.  Baranowski could not

remember whether he had ever discussed his feelings with other sergeants, although he made it clear

that he never would have talked with officers of lesser rank about such matters.  *Id.*

Waters described Baranowski's misgivings about the investigation as "bologna."  Doc. No.

36-2, p. 24.  In a deposition on June 19, 2007, Waters testified that the investigators who later arrived

on the scene were too competent to overlook discrepancies between the version of events described

by Nassan and Curry and the physical evidence that was left behind.  *Id.*  Although he admitted that

---

[11]"DX" was apparently a nickname.  Depp testified that he could not remember Mr. Smith's first name.
Doc. No. 35-4, p. 9.

he had discussed Baranowski's concerns with Depp, he indicated that the conversation had been brief because neither he nor Depp believed Baranowski's view to be credible. *Id.*, pp. 24, 27. When asked whether it was appropriate for Baranowski to express his concerns about the investigation, Waters explained that he did not care whether Baranowski made comments implying that a coverup was being orchestrated. *Id.*, p. 25. Waters further stated that Baranowski was entitled to "make a worksheet" on the matter if he really believed that the investigation had been conducted in an inappropriate manner. *Id.*, p. 27.

Baranowski's comments to Depp and Waters about the Ellerbe shooting, and his expressed reservations about the ensuing investigation into that incident, constitute the "speech" which he believes to be protected by the First and Fourteenth Amendments. At the outset, it is worth noting that the Court's inquiry is limited to the question of whether the speech was constitutionally "protected" from employer discipline. The Court acknowledges that, under Supreme Court precedent, Baranowski's speech enjoys constitutional protection in a more general sense. *Connick*, 461 U.S. at 147 ("For example, an employee's false criticism of his employer on grounds not of public concern may be cause for his discharge but would be entitled to the same protection in a libel action accorded an identical statement made by a man on the street."). Since his speech is not of the type which is categorically unprotected by the First Amendment (i.e., obscenity, child pornography involving the use of real children as models, defamation, fighting words, incitement to riot, false or misleading commercial speech, commercial speech advertising illegal products, etc.), the Court believes his comments to enjoy a significant measure of constitutional protection. *Ashcroft v. The Free Speech Coalition*, 535 U.S. 234, 249-258 (2002)(distinguishing between virtual child pornography, which enjoys First Amendment protection, and child pornography involving the

depiction of real children, which is categorically unprotected); *Peel v. Attorney Registration & Disciplinary Commission of Illinois*, 496 U.S. 91, 100-101 (1990)(distinguishing between truthful advertising, which is constitutionally protected, and false or misleading advertising, which may be prohibited); *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 504-505 (1984)(recognizing defamation, fighting words, incitement to riot, obscenity, and child pornography as unprotected categories of speech). That does not mean, however, that the Constitution shields such speech from *employer discipline*. *Bose Corp.*, 466 U.S. at 504, n. 22 ("Statements made by public employees in their employment capacity and not touching on matters of public concern may be considered unprotected in the sense that *employment-related sanctions* may be imposed on the basis of such statements.")(emphasis added).

In *Garcetti*, it was undisputed that the relevant "speech" (i.e., a deputy district attorney's disposition memorandum) was made pursuant to the employee's official duties. *Garcetti*, 126 S.Ct. at 1961. For this reason, the Supreme Court noted that it had "no occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate." *Id.* The Supreme Court nevertheless provided some guidance by describing the proper inquiry as "practical," thereby eschewing reliance on formal job descriptions which "often bear little resemblance to the duties an employee actually is expected to perform[.]"[12]

---

[12]The Supreme Court specifically limited its holding in *Garcetti* by acknowledging, in response to Justice Souter's dissenting opinion, that the analysis employed in that case may not be applicable to cases "involving speech related to scholarship or teaching[,]" since "expression related to academic scholarship or classroom instruction implicates additional constitutional interests that are not fully accounted for by [the] Court's customary employee-speech jurisprudence." *Garcetti v. Ceballos*, 126 S.Ct. 1951, 1962 (2006). Hence, the rule established in *Garcetti* may not be wholly absolute. The Supreme Court left open the possibility that academic speech (i.e., speech related to the scholarship or teaching of a university professor) may enjoy some measure of First Amendment protection from employer discipline even though it is undertaken pursuant to one's official duties. *Id.* Since Baranowski's speech obviously did not involve "academic scholarship or classroom instruction," the Court has little trouble concluding that the more generalized "practical" inquiry must be conducted in this case. *Id.* at 1961-1962.

*Id.* at 1961-1962. In *Foraker v. Chaffinch*, 501 F.3d 231, 240 (3d Cir. 2007), the United States Court of Appeals for the Third Circuit stated that "the question of whether a particular incident of speech is made within a particular plaintiff's job duties is a mixed question of fact and law."

Baranowski testified that his two conversations with Depp about the Ellerbe shooting occurred at the Uniontown barracks, and that his brief discussion with Waters about the matter took place at the Washington barracks. Doc. No. 26-9, p. 14. The Court acknowledges that Baranowski's First Amendment claims are not foreclosed solely because he made his statements in a workplace setting. *Garcetti*, 126 S.Ct. at 1959 ("That Ceballos expressed his views inside his office, rather than publicly, is not dispositive. Employees in some cases may receive First Amendment protection for expressions made at work."); *Rankin v. McPherson*, 483 U.S. 378, 379-392 (1987)(finding a First and Fourteenth Amendment violation where a public employer discharged a public employee for a controversial statement made inside of the workplace). It is also true that Baranowski's claims are not defeated merely because his communications involved the subject matter of his employment with the Pennsylvania State Police. *Id.* ("The First Amendment protects some expressions related to the speaker's job."). The critical question is whether his speech was made pursuant to his duties as a police officer. *Id.* at 1959-1960. It is that inquiry to which the Court now turns.

Baranowski has filed affidavits in opposition to the Motion for Summary Judgment filed by Waters and Depp. In his first affidavit, Baranowski asserts that, on December 24, 2002, he was the officer in charge at the Pennsylvania State Police's Uniontown barracks. Doc. No. 34-2, ¶ 2. Upon his arrival at the scene of the Ellerbe shooting, he was considered to be the "incident commander," since he was the highest ranking officer present on that occasion. *Id.* Baranowski states that it was not a part of his "official duties" to determine whether the shooting had occurred in the manner

relayed to him by Nassan and Curry, since such findings were formally made by the Internal Affairs Department ("IAD"). *Id.*, ¶ 4; Doc. No. 43, p. 7. He likewise states that it was not a part of his "official duties" to reflect on the facts surrounding the shooting. Doc. No. 34-2, ¶ 5.

At the outset, it is worth noting that the Court is not required to credit Baranowski's conclusory assertions about whether a particular action taken by him was in accordance with his official duties. These portions of his affidavit amount to nothing more than legal conclusions. *Oriakhi v. Wood*, 2006 WL 859543, at *2, 2006 U.S. Dist. LEXIS 20031, at *5-7 (M.D.Pa. March 31, 2006)(explaining that while a district court must view the evidence in the light most favorable to the non-moving party in disposing of a motion for summary judgment, it need not credit "mulled allegations" or "legal conclusions"). Moreover, the critical question is not whether Baranowski was obliged to *determine* whether Ellerbe had been shot in the manner described by Nassan and Curry, but whether Baranowski's *speech* was made pursuant to his official duties. Doc. No. 43, p. 7 (arguing that Baranowski "had no responsibility to *reach a conclusion* as to whether or not the State Troopers' version of the events involved in the shooting was true or untrue")(emphasis added); *Foraker*, 501 F.3d at 241 ("Price and Warren *spoke* internally with respect to the health conditions at their workplace. They were required to *speak* up the chain of command and were prevented from *speaking* to the press without prior approval.")(emphasis added). Baranowski, of course, bases his claims on a constitutional provision protecting "the freedom of *speech*[.]" U.S. CONST. amend. I (emphasis added).

In his second affidavit, Baranowski contends that, between July 2002 and July 2003, he was the Special Projects Coordinator and Station Intelligence Coordinator for the Uniontown station. Doc. No. 53-2, p. 2, ¶ 2. He states that, in this capacity, he was expected to: (1) organize and

implement programs to combat criminal trends, traffic issues and unusual events; (2) coordinate the implementation of special enforcement programs and projects; (3) locate and obtain local resources, funding and assistance for the use of the Pennsylvania State Police at the Uniontown station to better facilitate its public service; (4) collect data and report on the activities and results of the special projects undertaken; (5) facilitate the intelligence sharing from all sources, including community and police sources; (6) attend meetings for the purpose of encouraging the sharing of intelligence-related information with community leaders; and (7) encourage the use of email systems in order to effectuate the efficient exchange of information between different law enforcement entities. *Id.*, pp. 2-3, ¶ 3. He makes no attempt to explain the relationship between these duties and his status as the "incident commander" at the scene of the Ellerbe shooting.[13]

As noted earlier, the Court must take a "practical" look at Baranowski's job duties in order to determine whether his speech was made pursuant to such duties. *Garcetti*, 126 S.Ct. at 1961. It is of no moment that *formal* determinations as to whether a particular incident has occurred as described were made by the IAD, or that Baranowski's *formal* job description did not require him to relay his concerns about the Ellerbe investigation to his superiors. Doc. Nos. 34-2, pp. 3-4, ¶ 4, 53-2, pp. 2-3, ¶ 3. As the Supreme Court explained in *Garcetti*, "[f]ormal job descriptions often bear

---

[13]In *Hackman v. Valley Fair*, 932 F.2d 239, 241 (3d Cir. 1991), the United States Court of Appeals for the Third Circuit declared that "[w]hen, without a satisfactory explanation, a nonmovant's affidavit contradicts earlier deposition testimony, the district court may disregard the affidavit in determining whether a genuine issue of material fact exists." The Court of Appeals affirmed the continuing vitality of this "sham affidavit" doctrine in *Jiminez v. All American Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007), noting that "[a] sham affidavit is a contradictory affidavit that indicates only that the affiant cannot maintain a consistent story or is willing to offer a statement solely for the purpose of defeating summary judgment." It is not necessary for the Court to determine whether Baranowski's latest affidavit should be disregarded as inconsistent with his prior testimony concerning his duties as the "incident commander" at the scene of the Ellerbe shooting, since he cannot defeat the Defendants' Motion for Summary Judgment even if the affidavit is considered. The recitation of Baranowski's job duties as the Special Projects Coordinator and Station Intelligence Coordinator for the Uniontown station sheds no light on his duties as the incident commander. Doc. No. 53-2, pp. 2-3, ¶¶ 2-3.

little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." *Garcetti*, 126 S.Ct. at 1962.

Given the vagueness of the contours identified by the Supreme Court with respect to the inquiry as to the scope of a public employee's official duties, the Court must glean certain principles from decisions which have been issued in the aftermath of *Garcetti*. It is clear that speech *required* by a public employee's official duties cannot form the basis for a First Amendment retaliation claim akin to that asserted by Baranowski in this case. *Williams v. Dallas Independent School District*, 480 F.3d 689, 693 (5th Cir. 2007). Even if speech is not actually required of a public employee, it may nevertheless be "in accordance with" his or her official duties. *Casey v. West Las Vegas Independent School District*, 473 F.3d 1323, 1330 (10th Cir. 2007). Indeed, an optional inquiry undertaken by a public employee is made in accordance with his or her official duties when it is pursued for the purpose of obtaining job-related information. *Williams*, 480 F.3d at 694. Moreover, a public employee can sometimes speak pursuant to his or her official duties by volunteering unsolicited comments or criticisms. *Mills v. City of Evansville*, 452 F.3d 646, 647-648 (7th Cir. 2006). Expressive activity can be deemed to be "official" for purposes of *Garcetti* even if it is not included within a public employee's "everyday job functions." *Battle v. Board of Regents*, 468 F.3d 755, 761, n. 6 (11th Cir. 2006). What matters is whether the expression is *itself* made pursuant to one's official duties, not whether it is made in a work-related setting. *Lindsey v. City of Orrick*, 491 F.3d 892, 895-898 (8th Cir. 2007). *Garcetti* itself makes it clear that the more analogous speech is to expressions made by members of the general public, the more likely it is to constitute potentially

protected speech "as a citizen." *Garcetti*, 126 S.Ct. at 1961 ("Employees who make public statements outside the course of performing their official duties retain some possibility of First Amendment protection because that is the kind of activity engaged in by citizens who do not work for the government."). Conversely, uniqueness to the public setting is a characteristic that makes speech less likely to enjoy First Amendment protection from employment-related retaliation. *Id.* ("When a public employee speaks pursuant to employment responsibilities, however, there is no relevant analogue to speech by citizens who are not government employees.").

Baranowski testified that his discussions with Depp about the Ellerbe shooting had occurred because of Depp's inquiries. Doc. No. 26-9, pp. 17-18, 26. Thus, it may be that he was *required* to discuss his feelings about the incident. In such a situation, it would be clear that he spoke (at least in his conversations with Depp) pursuant to his official duties. *Williams*, 480 F.3d at 693. Nonetheless, Baranowski cannot survive the Defendants' Motion for Summary Judgment even if it is assumed that he was not required to relay his views about the Ellerbe shooting to his superiors.[14]

Neither *Garcetti* nor *Foraker* established a framework for determining whether a particular expression constitutes speech pursuant to one's official duties. The Court will not attempt to develop such a framework in this case. Although it is not entirely clear where the "practical" inquiry into a public employee's job duties purports to draw the dispositive line of demarcation, the Court is convinced that Baranowski's speech to Waters and Depp clearly falls on the "official duties" side

---

[14]The Defendants have submitted a Pennsylvania State Police document which lists, in very general terms, what is expected of police officers. Doc. No. 59-2. The document, which is entitled "Pennsylvania State Police Field Regulation 1-1," includes the following language: "Members shall promptly report to their supervisor any information which comes to their attention and which tends to indicate that any other member or employee has violated any law, rule, regulation or order." *Id.*, p. 15. Thus, it appears that an officer in Baranowski's position would be required to report misgivings about statements made by fellow officers accused of wrongdoing. Nevertheless, the Court need not dwell on the language of the general field regulation in this case, since Baranowski's formal job description is not dispositive of the First Amendment issue.

of the line. In so concluding, the Court is guided by the factually analogous case of *Sigsworth v. City of Aurora*, 487 F.3d 506 (7th Cir. 2007). In *Sigsworth*, the United States Court of Appeals for the Seventh Circuit was called upon to decide whether a police detective spoke pursuant to his official duties when he told his supervisors that he suspected that key targets in a drug raid had been able to evade arrest because they had been forewarned of the raid by some members of a task force created to investigate gang activity. *Sigsworth*, 487 F.3d at 507. When the detective relayed his suspicions to his supervisors, one of them instructed him to remain silent about the matter. *Id.* at 508. The detective was subsequently removed from both the task force and the relevant investigation. *Id.* The Seventh Circuit held that his complaints had been made pursuant to his official duties rather than in his capacity as a private citizen. *Id.* at 510-511.

As in *Sigsworth*, Baranowski allegedly complained to his superiors about potential misconduct on the part of other police officers. Moreover, according to Baranowski's deposition testimony, Depp told him not to become involved with the investigation into the Ellerbe shooting. Doc. No. 26-9, p. 18. Retaliation for Baranowski's speech allegedly followed. In that sense, as well, the facts of this case are similar to those in *Sigsworth*.

In determining that the detective's complaints did not constitute speech "as a citizen," the Seventh Circuit relied heavily on the plaintiff's complaint, which included averments indicating that he had complained in furtherance of a policy of cooperation between different law enforcement agencies. *Sigsworth*, 487 F.3d at 511 ("In accordance with the policy of cooperation and orders to communicate with the deputy chief of police, Sigsworth reported the observed misconduct connected to the operation that he had helped to conceive and for which he had supervisory responsibilities."). In this case, the complaint contains similar averments. The relevant portion of Baranowski's

complaint states:

> 6.      On the 24th day of December, 2002, two state police officers assigned to the Uniontown Barracks, shot and killed Michael Ellerbe, a 12 year old minor. Plaintiff Baranowski was the "incident commander" on the scene after the shooting occurred.
>
> 7.      Subsequent to the shooting of the minor, Michael Ellerbe, plaintiff Baranowski, in his capacity as the "incident commander["], and also as a use of force expert, complained to supervisors concerning the handling of the investigation into the shooting.
>
> 8.      Shortly after making that complaint, defendant Depp warned Baranowski that adverse consequences would befall him if he was assisting the Ellerbe family in any claim against the State Police.
>
> 9.      In February 2003, Baranowski informed supervisors of his belief that the Ellerbe shooting had not occurred as reported by the defendant officers involved in the shooting and that the Pennsylvania State police were covering up the truth.
>
> 10.      Following plaintiff's complaints in February 2003, the defendants retaliated against the plaintiff subjecting him to repeated instances of unwarranted discipline and the removal of his duties as a sergeant, this retaliatory conduct culminating in plaintiff's constructive discharge in July, 2003 when plaintiff's badge and assigned weapon were confiscated.

Doc. No. 1, ¶¶ 6-10. What was true in *Sigsworth* is true in this case. Baranowski's complaint affirmatively avers that he complained to his superiors *in his capacity as the incident commander*.[15] *Id.*, ¶ 7. He is bound by this averment. *Parilla v. IAP Worldwide Services, VI, Inc.*, 368 F.3d 269, 275 (3d Cir. 2004)("Such specific findings of fact by the District Court were unnecessary, however, as Parilla expressly conceded those facts *in her complaint*.")(emphasis added). The complaint, of course, was filed eight months before the Supreme Court issued its decision in *Garcetti*. When he

---

[15]When Baranowski filed his complaint, he certified to the Court that, to the best of his knowledge, the allegations contained therein had evidentiary support, or that discovery would provide evidentiary support for such allegations. *Fed. R. Civ. P. 11(b)(3).*

commenced this action, Baranowski apparently did not believe that it would be detrimental to his case to aver that he had complained *in his capacity as the incident commander* at the scene of the Ellerbe shooting. Nevertheless, his pre-*Garcetti* characterization of his own comments speaks volumes about how *he* viewed his speech. Having affirmatively averred that he spoke to Waters and Depp pursuant to his duties as the incident commander, Baranowski cannot escape the unforeseen consequences of his averments by relying on the pretense that a genuine issue of material fact exists as to whether he spoke "as a citizen" for purposes of *Garcetti*. Doc. No. 53, p. 3.

While the intervening decision in *Garcetti* certainly changed the focus of the legal inquiry in this case, it cannot be said to have changed the facts upon which this action was commenced. With that understanding, the Court is convinced that Baranowski spoke to Waters and Depp pursuant to his official duties when he complained about the investigation into the Ellerbe shooting. It cannot be doubted that Baranowski's duties included providing information about the shooting. *Foraker*, 501 F.3d at 241 ("Thus, the controlling fact in the case at bar is that Price and Warren were expected, pursuant to their job duties, to report problems concerning the operations at the range up the chain of command."). Indeed, he does not dispute that his preparation of the report on December 27, 2002, constituted a job-related task.[16] It makes no difference whether Baranowski's later complaints went beyond his *daily* job duties.[17] *Vose v. Kliment*, 506 F.3d 565, 572 (7th Cir. 2007)("While Vose may have gone beyond his ordinary *daily* job duties in reporting the suspected misconduct outside his

---

[16]Pennsylvania State Police Field Regulation 1-1 contains specific language requiring police officers involved in an investigation to submit written statements about any incidents leading to public criticism of the Pennsylvania State Police, and "to truthfully and completely answer all questions relating thereto." Doc. No. 59-2, p. 19.

[17]Baranowski apparently believes that he spoke "as a citizen" because his speech went beyond his *routine* job duties. Doc. No. 53, p. 2. He is mistaken. Not all speech that goes beyond one's routine job duties qualifies for First Amendment protection from employer discipline. *Vose v. Kliment*, 506 F.3d 565, 572 (7th Cir. 2007).

unit, it was not beyond his official duty as a sergeant of the narcotics unit to ensure the security and propriety of the narcotics unit's operations.")(emphasis in original). Although *some* of the details concerning Ellerbe's death were to be determined at a later date (via an autopsy or otherwise), it was not beyond Baranowski's official duties as the "incident commander" on the scene to provide a certain amount of relevant information. Doc. No. 26-9, p. 25. Baranowski's motivation for expressing his views to Waters and Depp is of no constitutional significance. *Foraker*, 501 F.3d at 242 ("There is some suggestion in the record that Price's search for external assistance may have been motivated by personal concerns, but the fact that Price may have exceeded the expectations of his formal job description as a firearms instructor does not mean that they were not within the scope of his duties.").

The Court's conclusion that Baranowski spoke pursuant to his official duties, rather than "as a citizen," is buttressed by Baranowski's testimony that he would not have discussed a matter such as the Ellerbe shooting with police officers of lesser rank. Doc. No. 26-9, p. 35. Though the "practical" inquiry established by *Garcetti* eschews singular reliance upon any particular factor, the capacity in which a public employee speaks can sometimes be illustrated by reference to *whom* the relevant expression is directed. *Foraker*, 501 F.3d at 241 ("They were required to speak up the chain of command and were prevented from speaking to the press without prior approval."). In the absence of "a comprehensive framework for defining the scope of an employee's duties" in a case such as this, the Court is left only with the language in *Garcetti* indicating that the question of whether a public employee speaks "as a citizen" generally turns on whether the speech at issue can be fairly characterized as a "relevant analogue to speech by citizens who are not government employees." *Garcetti*, 126 S.Ct. at 1961. While "private" comments by public employees are

sometimes entitled to constitutional protection from employer discipline, that is generally true only when such comments are somewhat analogous to statements typically made by members of the general public. *Rankin*, 483 U.S. at 379-392 (concluding that a public employer violated the First and Fourteenth Amendments by terminating a clerical employee in response to a private comment which the employee had made to her boyfriend). Baranowski's caution in limiting his audience to those of higher or equal rank within the Pennsylvania State Police indicates that he was speaking as a police officer rather than "as a citizen." Hence, the First Amendment's Free Speech Clause did not protect him from employer discipline.

The Court does not doubt that Baranowski's speech involved a matter of "public concern" for purposes of the *Pickering* analysis. Doc. No. 43, pp. 4-5. Given the Court's determination that Baranowski did not speak "as a citizen," however, there is no need for *Pickering* balancing in this case. *Vose*, 506 F.3d at 569 ("We accept that police misconduct is a matter of public concern, but as this analysis illustrates, that is no longer the initial inquiry on First Amendment retaliation claims."). The Court's conclusion also moots the causation inquiry, since Baranowski cannot establish a violation of the Free Speech Clause even if his constructive discharge was *caused* by his remarks to Waters and Depp.[18] Doc. No. 43, pp. 8-12.

In his complaint, Baranowski does not specify which provision of the First Amendment is applicable in this case. Doc. No. 1, ¶ 14 (making a general reference to Baranowski's rights under the First and Fourteenth Amendments). The Establishment Clause, the Free Exercise Clause and the Free Press Clause are obviously not implicated by his allegations. Since Baranowski focuses his

---

[18]Baranowski has extensively briefed the issue of causation, contending that the reasons given by the Defendants for the disciplinary actions taken against him are unworthy of belief. Doc. Nos. 43, pp. 8-12, 53, p. 6. The Court need not address Baranowski's arguments concerning causation.

arguments on the framework established in *Pickering*, the Court has thus far proceeded on the assumption that his "First Amendment retaliation" claims are based on the Free Speech Clause. Doc. No. 43, pp. 3-9, 14-17. He does not appear to place any reliance on the Petition Clause. Nevertheless, for the sake of completeness, the Court will briefly address the Petition Clause implications raised by the record in this case. Like the Free Speech Clause, the Petition Clause is applicable to the States by virtue of the Due Process Clause of the Fourteenth Amendment. *Tarpley v. Keistler*, 188 F.3d 788, 794, n. 4 (7th Cir. 1999).

A public employee, like any other citizen, has a right under the Petition Clause to voice complaints to public officials. *Freitag v. Ayers*, 468 F.3d 528, 545 (9th Cir. 2006). In *San Filippo v. Bongiovanni*, 30 F.3d 424, 439-443 (3d Cir. 1994), the United States Court of Appeals for the Third Circuit determined that the "public concern" prerequisite to a public employee's claim under the Free Speech Clause was not applicable to claims arising under the Petition Clause. In so holding, the Court of Appeals focused on the distinction between a public employee's attempt to appeal to the general public (i.e., speaking out publicly) and his or her attempt to address the government directly (i.e., "petitioning" a public official). *San Filippo*, 30 F.3d at 442. It is unclear whether the rule established in *Garcetti* applies to Petition Clause claims as well as Free Speech Clause claims. *Foraker*, 501 F.3d at 237-238 (declining to address the question on the ground that the communications at issue did not constitute petitioning activity); *Foraker*, 501 F.3d at 247-249 (Greenberg, J., concurring)(arguing that the *Garcetti* rule applies to Petition Clause claims as well as Free Speech Clause claims). Nevertheless, that question is inconsequential, since Baranowski's statements to Waters and Depp did not constitute petitioning activity. Baranowski complained internally, speaking only with his superiors. *Foraker*, 501 F.3d at 237 ("Price and Warren

complained internally; they did not petition a state agency qua agency. They appealed to their employer, which also happened to be a state agency, through informal channels."). A public employee's informal complaints are not transformed into petitioning activity merely because he or she happens to be employed by the government rather than by a private entity. *Hill*, 455 F.3d at 242, n. 24. Moreover, Baranowski testified that Depp had called him into his office for the purpose of discussing the Ellerbe shooting. Doc. No. 26-9, pp. 17-18. Therefore, it does not appear that Baranowski had the option of avoiding discussion of the topic. "Statements made under compulsion do not comport with the basic principle of freedom underlying the Petition Clause." *Foraker*, 501 F.3d at 238. Since Baranowski did not engage in petitioning activity, the Court has no occasion to consider whether the Supreme Court's analysis in *Garcetti* is applicable to claims brought under the Petition Clause. It suffices to say that Baranowski's comments to his superiors constituted neither formal nor informal petitions, and that the arguments raised in his briefs indicate that he never intended to rely on the Petition Clause in any event. *Id.* at 236-237 (explaining the distinction between formal petitions, which are "defined by their invocation of a formal mechanism of redress[,]" and petitions made through informal channels, which "may occasion a lesser degree of constitutional protection than their formal counterparts").

Although § 1983 speaks of no immunities, the Supreme Court has always assumed that Congress would have expressly abolished the common law immunities enjoyed by state officials within the language of § 1983 if it had intended to do so. *Pierson v. Ray*, 386 U.S. 547, 554-555 (1967). Consequently, the "qualified immunity" that was available to state officials at common law is available to defendants such as Waters and Depp. *Kalina v. Fletcher*, 522 U.S. 118, 131-135 (1997)(Scalia, J., concurring)(discussing the common law origins of the different forms of immunity

available to state officials sued under § 1983). Waters and Depp have raised the defense of qualified immunity in this case, and the parties have extensively briefed the issue. Doc. Nos. 24, pp. 12-19, 43, pp. 14-15, 48, pp. 12-14. This issue, however, has been mooted by the Court's determination that Baranowski spoke pursuant to his official duties, and that his speech did not constitute petitioning activity for purposes of the Petition Clause. Since Waters and Depp are entitled to summary judgment on the ground that Baranowski cannot establish a violation of the First and Fourteenth Amendments, the issue of qualified immunity need not be examined in this case. *Saucier v. Katz*, 533 U.S. 194, 201 (2001)("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity.").

In concluding that the record in this case cannot support a finding that Baranowski's rights under the First and Fourteenth Amendments have been violated, the Court does not mean to trivialize the importance of speech designed to expose wrongdoing within a governmental bureaucracy. Nevertheless, it is critically important to remember that "it is a *constitution* we are expounding." *McCulloch v. Maryland*, 17 U.S. 316, 407 (1819)(emphasis added). To say that the Constitution does not protect a certain category of speech from discipline imposed by a public employer is not to say that such speech can enjoy no legal protection whatsoever. If the people of Pennsylvania wish to provide public employees with protection from employer discipline imposed in retaliation for comments of the kind allegedly uttered by Baranowski, they are free to do so (if they have not done so already) by invoking the normal legislative process. Whistleblower statutes can be used to fill the gap between the requirements of the Constitution and the needs of a well-ordered society. *Wilburn v. Robinson*, 480 F.3d 1140, 1150, n. 14 (D.C.Cir. 2007).

Baranowski bases his claims solely on the First and Fourteenth Amendments to the United

States Constitution.  Doc. No. 1, ¶¶ 1, 14.  He does not purport to rely on any other sources of substantive law.  Since he did not speak "as a citizen" when he expressed his reservations about the Ellerbe investigation to Waters and Depp, the Constitution did not protect him from retaliatory employer discipline.  *Garcetti*, 126 S.Ct. at 1956-1962.  To hold otherwise would be to confuse "a public employee's right, as a citizen, to participate in discussions concerning public affairs" with Baranowski's "attempt to constitutionalize the employee grievance" in this case.  *Connick*, 461 U.S. at 154.

## V.    Conclusion

Because Baranowski did not commence this action until more than two years after Waters and Depp "constructively discharged" him, this action is barred by Pennsylvania's two-year statute of limitations.  Moreover, since Baranowski did not speak "as a citizen" when he relayed his concerns about the Ellerbe shooting to his superiors, the Constitution did not protect him from the retaliatory acts alleged in the complaint.  For these reasons, the Defendants are entitled to summary judgment.  Accordingly, Defendants' Motion for Summary Judgment [23] will be granted.  An appropriate order follows.

*s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Dated: March 18, 2008

cc/ecf:  All counsel of record.